# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# ST. JOSEPH DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**,<br>　　　　Plaintiff,<br><br>v.<br><br>**$20,000 IN UNITED STATES CURRENCY**.<br>　　　　Defendant | Case No. |

## COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, United States of America, by its attorneys, Teresa A. Moore, United States Attorney for the Western District of Missouri, and Leigh Farmakidis, Assistant United States Attorney, brings this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

### NATURE OF THE ACTION

1. This is an action to forfeit property to the United States for violations of 18 U.S.C. § 981(a)(1)(A) and 21 U.S.C. § 881(a)(6).

### THE DEFENDANT *IN REM*

2. The defendant $20,000 in United States currency was seized on January 4, 2022, during a traffic stop at the intersection of U.S. Highway 36 and Nettleton Road, Caldwell County, Missouri.

### JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a). This Court also has jurisdiction over this particular action under 18 U.S.C. §

981(a)(1)(A) and 21 U.S.C. § 881(a)(6).

4. This Court has *in rem* jurisdiction over the defendant property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district and pursuant to 28 U.S.C. § 1355(b)(1)(B), incorporating 28 U.S.C. § 1395, because the defendant property is found in this district.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district and pursuant to 28 U.S.C. § 1395, because the action accrued in this district and the defendant property is found in this district.

## BASIS FOR FORFEITURE

6. The defendant property is subject to forfeiture pursuant 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or an attempted transaction in violation 18 U.S.C. § 1956.

7. The defendant property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes: 1) money, negotiable instruments, securities and other things of value furnished and intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; 2) proceeds traceable to such an exchange; or 3) money, negotiable instruments, and securities used and intended to be used to facilitate a violation of the Controlled Substances Act.

## FACTS

8. On January 4, 2022, at approximately 4:35 p.m., a Missouri State Highway Patrol ("MSHP") trooper ("the Trooper") was patrolling eastbound on U.S. Highway 36

2

("U.S. Hwy 36"), near State Route K, in Caldwell County, Missouri.

9. While patrolling, the Trooper observed a white SUV headed westbound that appeared to be traveling faster than the posted speed limit.

10. The Trooper activated his patrol vehicle's front radar antenna and observed the vehicle's speed at 88 miles per hour in an area with a speed limit of 65 miles per hour.

11. The Trooper turned around and attempted to overtake the vehicle. While catching up, the Trooper observed the white SUV brake abruptly and turn southbound, crossing the eastbound lanes of U.S. Hwy 36 onto Nettleton Road.

12. The Trooper observed the SUV turn into the MFA Oil Station, stop, turn around, and exit the MFA parking lot.

13. The Trooper activated his patrol vehicle's emergency equipment and initiated a traffic stop on northbound Nettleton Road at U.S. Hwy 36.

14. The Trooper exited his patrol vehicle and approached the white Honda Pilot and noticed the vehicle was bearing a California license plate.

15. The Trooper contacted the male driver and advised him that the reason for the stop was a speeding violation.

16. The Trooper identified the driver by his Colorado driver's license as Alen Libedinsky ("Libedinsky").

17. The Trooper asked Libedinsky for the proof of vehicle insurance.

18. Libedinsky advised that the vehicle was not his and made no attempt to locate an insurance card, failing to open any of the vehicle's compartments.

19. When the Trooper asked about the purpose of his trip, Libedinsky advised

that he had driven his friend's dog to Ohio and was returning to Denver, Colorado.

20. The Trooper requested Libedinsky accompany him to the patrol vehicle to continue the administrative tasks of the traffic stop.

21. Inside the patrol vehicle, Libedinsky appeared very nervous and anxious.

22. The Trooper asked Libedinsky where he was coming from; Libedinsky looked away, touched his face, and said, "Uh from uh, Ohio."

23. The Trooper asked Libedinsky why his friend had not taken his dog to Ohio himself, and Libedinsky advised that his friend could not fly with the dog because it was not a service animal.

24. The Trooper asked Libedinsky who owned the vehicle, and Libedinsky advised that it belonged to his friend, Tommy Gonzalez.

25. The Trooper conducted a search of the Honda Pilot's VIN using a police database.

26. The registration showed the vehicle belonging to a Li Jiao from Arcadia, California.

27. The Trooper asked Libedinsky who Jiao was, and Libedinsky speculated that it might be Gonzalez's cousin as Gonzalez had purchased the vehicle from his cousin one year prior.

28. The Trooper asked Libedinsky if he had picked his friend up in California before driving to Ohio. Libedinsky said that he had not; rather, Gonzalez had driven to Colorado to see his girlfriend and brought the dog with him.

29. The Trooper requested MSHP personnel check Libedinsky's criminal

4

history.

30. While waiting on the criminal history check, the Trooper asked Libedinsky if this was his first trip from Denver to Ohio; Libedinsky advised that it was.

31. The Trooper ask Libedinsky when he had left Denver, and Libedinsky answered that he left Denver the day before and was already on his way back.

32. The one-way distance from Denver, Colorado, to Columbus, Ohio, is approximately 1,260 miles and 18.5 hours of driving.

33. Libedinsky's criminal record revealed an arrest for Felony Possession of a Controlled Substance on July 8, 2015, in Whatcom County, Washington.

34. MSHP Troop H Radio advised the Trooper that Libedinsky had a prior drug possession arrest.

35. The Trooper asked Libedinsky whether there were any drugs in the car, such as marijuana, methamphetamine, or cocaine; Libedinsky answered, "No."

36. The Trooper asked Libedinsky whether there were any illegal weapons in the vehicle, and again asked whether there was marijuana in the vehicle; Libedinsky again answered, "No."

37. The Trooper asked Libedinsky if there were any sums of money of more than $10,000 in the vehicle; Libedinsky looked away and answered, "No."

38. The Trooper again asked Libedinsky if he had any prior arrests or drug charges; Libedinsky looked down, shook his head, and answered, "No."

39. The Trooper challenged Libedinsky about his prior drug arrest and asked Libedinsky why he had lied; Libedinsky responded that he thought his prior drug arrest

5

was off his record.

40. Based on the totality of the circumstances, the Trooper requested consent to search the vehicle; Libedinsky gave his verbal consent.

41. The Trooper conducted a search of the vehicle and located a baggy with a small amount of marijuana "shake" in the pocket on the back of the driver's seat.

42. Libedinsky rolled down the passenger side window of the patrol car and asked the Trooper what he had found.

43. The Trooper advised Libedinsky it looked like "weed."

44. Libedinsky responded that he did not use marijuana.

45. The Trooper continued the search of the Honda Pilot. In the glove compartment on the passenger side, the Trooper located a plastic bag, containing a large amount of United States currency.

46. The currency was in three separate stacks; one stack was banded with only $100 bills, one stack was banded with only $50 bills, and the last stack was banded with only $20 bills.

47. Such packaging and denominations are consistent with proceeds from the sale of narcotics.

48. The Trooper returned to the patrol car and asked Libedinsky about the currency, but Libedinsky said he did not know anything about the money because it was not his car.

49. At approximately 5:10 p.m., the Trooper advised Libedinsky of his *Miranda* rights, which Libedinsky advised he understood.

6

Case 5:22-cv-06052-GAF   Document 1   Filed 05/12/22   Page 6 of 13

50. At approximately 5:25 p.m., the Trooper was contacted by a Drug Enforcement Administration Task Force Officer (TFO) by telephone.

51. The TFO conducted an interview with Libedinsky over speaker phone with the Trooper present.

52. During the interview, Libedinsky stated the following:

   a. The currency seized did not belong to him, and he could not provide an explanation as to why it was in the glovebox.
   b. Libedinsky was a landscaper who worked "1099 type" jobs.
   c. The trip was set up by Tommy Gonzalez. Gonzalez was a friend of Libedinsky's best friend, and Libedinsky did not know Gonzalez very well. Libedinsky took Gonzalez's dog and a box of Gonzalez's things and was told to meet Gonzalez's cousin at a gas station in Columbus, Ohio.
   d. Libedinsky was unable to provide a name, phone number, or address of the person he met in Columbus, Ohio, nor could he provide the address of the gas station where he met Gonzalez's cousin to drop off the dog.
   e. Libedinsky was not paid for the trip and was just doing it as a favor to a friend of a friend.
   f. Libedinsky was going to stay with his friends "Sky" and "Evan" in Kansas City, but would not provide their last name(s), address(es), or phone number(s).
   g. Libedinsky took U.S. Hwy 36, rather than the more common and faster I-70 or I-80 because he "got lost."
   h. The trip was directly round-trip from Denver, Colorado, to Columbus, Ohio, out and back, with no extended stops.

53. After the interview, the Trooper seized the currency pending further investigation.

54. At approximately 6:05 p.m., Libedinsky followed the Trooper to the Cameron Police Department, where the Trooper and a MSHP Sergeant counted the currency.

7

55. The denominations and value of the currency were:

| # of Bills | Denomination | Total |
|---:|---:|---:|
| 100 | $100 | $10,000 |
| 22 | $ 50 | $1,100 |
| 445 | $ 20 | $8,900 |
| **TOTAL** | | **$20,000** |

56. The Trooper gave Libedinsky a copy of the Property Record as a receipt for the currency and advised Libedinsky that he was free to leave.

57. The currency is currently in the custody and control of the United States Marshals Service in the Western District of Missouri.

## POST-SEIZURE INVESTIGATION

*I. Vehicle*

58. Investigators conducted a search using a police database which collects information on vehicles based on VIN and discovered the Honda Pilot was leased to "Li Jiao Lse" in Arcadia, California.

59. Investigators learned the vehicle had been leased on May 12, 2021, with 7 miles on the odometer.

60. Since its leasing, the vehicle had two reported oil changes: one on August 13, 2021, with a reported odometer reading of 18,001 miles, and a second on January 9, 2022, five days after this stop, with a reported mileage of 43,662 on the odometer.

61. According to Honda.com, the top restriction for their leased vehicles is 15,000 miles per year with additional miles available with purchase.

62. The Honda Pilot displayed an exceptional number of miles (43,000 miles) for a vehicle that had only been in operation for approximately eight months, especially

8

under the constraints of a lease where each additional mile is subject to the imposition of an additional fee.

63. Upon information and belief, investigators know rapid accrual of mileage on a vehicle is consistent behavior for a courier as a lease precludes the forfeiture of the vehicle as an asset, and the mileage would reflect frequent long trips.

64. Upon information and belief, investigators also know that lack of knowledge of the owner of the vehicle that a driver is operating cross-country, and lack of knowledge regarding any of the required insurance documents are indicative of behavior of a courier.

65. Upon information and belief, trips of short duration are consistent with the transportation of controlled substances and/or proceeds from the distribution of those controlled substances.

66. Upon information and belief, the travel itinerary is consistent with the known flow of controlled substances to distribution areas and illicit proceeds back to source areas.

*II. Cellular Phone Records*

67. Investigators attempted to reach Gonzalez at the telephone number provided by Libedinsky by both call and/or text to corroborate Libedinsky's assertions, but all attempts were unsuccessful.

68. As of January 11, 2022, the number Libedinsky provided for Gonzalez had been disconnected.

69. Investigators served a subpoena to T-Mobile for Libedinsky's telephone

9

records.

70. T-Mobile produced Libedinsky's cellular telephone records, which showed just a single call to the telephone number Libedinsky claimed was Gonzalez's on December 14, 2021.

### III. Financial Investigation

71. Investigators also examined financial and business information related to Jiao Li.

72. Investigators identified multiple businesses registered in California in the name of Jiao Li, including Jioa Jiao Spa LLC, Jiao Li Bakery, JiaoJiao Beauty LLC, and Jinlong Footwear.

73. The addresses listed with the California Secretary of State for these business entities are residential addresses. Investigators were unable to find any indication that the entities were associated with storefronts or commercial business locations.

74. Investigators also obtained bank records for Jiao Li and entities registered in her name.

75. Bank of America records from April and May 2021 reflect 15 cash deposits in both personal and business accounts associated with Jiao Li, made in multiple locations, including New York, Maryland, Massachusetts, and California, ranging from $5,000 to $40,000.

## CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF

76. The Plaintiff repeats and incorporates by reference the paragraphs above.

77. By the foregoing and other acts, defendant $20,000 in United States currency constitutes moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. § 801, *et seq.*, and therefore, is forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

### SECOND CLAIM FOR RELIEF

78. The Plaintiff repeats and incorporates by reference the paragraphs above.

79. By the foregoing and other acts, defendant $20,000 in United States currency constitutes proceeds traceable to an exchange of moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. § 801, *et seq.*, and therefore, is forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

### THIRD CLAIM FOR RELIEF

80. The Plaintiff repeats and incorporates by reference the paragraphs above.

81. By the foregoing and other acts, defendant $20,000 in United States currency constitutes moneys, negotiable instruments, securities, or other things of value used or intended to be used to facilitate any violation of 21 U.S.C. § 801, *et seq.*, and therefore, is forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

FOURTH CLAIM FOR RELIEF

82. The Plaintiff repeats and incorporates by reference the paragraphs above.

83. By the foregoing and other acts, defendant $20,000 in United States currency was involved in a transaction or an attempted transaction in violation 18 U.S.C. § 1956, and therefore is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE the United States prays that the defendant property be forfeited to the United States, that the plaintiff be awarded its costs and disbursements in this action, and for such other and further relief as the Court deems proper and just.

                         Teresa A. Moore
                         United States Attorney

By
                         */s/ Leigh Farmakidis*
                         Leigh Farmakidis
                         Assistant United States Attorney
                         400 E. 9th Street, Fifth Floor
                         Kansas City, Missouri 64106
                         Telephone: (816) 426-3122
                         Leigh.Farmakidis@usdoj.gov

## VERIFICATION

I, Task Force Officer Jeffrey M. Owen, hereby verify and declare under penalty of perjury that I am a Task Force Officer with the United States Drug Enforcement Administration, that I have read the foregoing Verified Complaint *in Rem* and know the contents thereof, and that the factual matters contained in paragraphs eight through 75 of the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Task Force Officer of the Drug Enforcement Administration.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated: _____

*Jeffery M. Owen*
Jeffrey M. Owen
Task Force Officer
Drug Enforcement Administration